[Cite as *In re R.L.*, 2014-Ohio-5065.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

IN RE: R.L.                                    :

                                               :         C.A. CASE NO.     26232

                                               :         T.C. NO.     2013-6979

                                               :         (Civil appeal from Common
                                                          Pleas Court, Juvenile Division)

                                               :

                                               :

· · · · · · · · · ·

**O P I N I O N**

Rendered on the _____14th_____ day of _____November_____, 2014.

· · · · · · · · · ·

TIFFANY C. ALLEN, Atty. Reg. No. 0089369, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

BRADLEY S. BALDWIN, Atty. Reg. No. 0070186, 854 E. Franklin Street, Centerville, Ohio 45459
        Attorney for Defendant-Appellant

· · · · · · · · · ·

FROELICH, P.J.

{¶ 1} R.L. appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which found that he had committed a rape of a person whose ability to resist or consent was substantially impaired, which, if committed as an adult, would have been a felony of the first degree. The court adjudicated R.L. to be a delinquent child and committed him to the Department of Youth Services for a minimum of one year and up to the age of 21; the court suspended the commitment and placed R.L. on probation, on the conditions that R.L. comply with all court orders, laws, and probationary rules. R.L. appeals from the trial court's judgment.

{¶ 2} For the following reasons, the judgment of the trial court will be affirmed.

{¶ 3} On July 30, 2013, R.L., age 9, was accused of raping his mentally and physically disabled cousin, D.G., an adult woman, in the apartment of D.G.'s mother, R.L.'s aunt. On October 7, 2013, a complaint was filed against R.L. He filed a request for a competency evaluation and a motion to suppress statements he had made to the police. A hearing was held on the motion to suppress, at which the competency issue was also addressed. The motion to suppress was overruled.

{¶ 4} With regard to the competency issues, the psychologist stated that she had conducted an extensive evaluation of R.L. She concluded that R.L. had attention deficit hyperactivity disorder and symptoms of "attention and concentration difficulties" for which he "could" benefit from medication, but that he was "capable of focusing and participating in" conversations and legal proceedings. She further stated that R.L. was able to explain his account of "what had happened" with her assistance; he benefits from having information

explained slowly and having an opportunity to ask questions.   It is unclear from the record whether R.L. was on medication at the time of the alleged offense.   The parties stipulated to R.L.'s competence based on the psychologist's conclusions.

{¶ 5}     On March 17, 2014, R.L. was tried to the court. On March 24, 2014, the trial court found R.L. responsible for the commission of rape, as alleged in the complaint. On the basis of that disposition, on May 1, 2014, the trial court found R.L. to be a delinquent child. The trial court committed R.L. to the Department of Youth Services, as described above; his commitment was suspended and he was placed on probation.

{¶ 6}     R.L. appeals from the trial court's order of disposition, raising four assignments of error.

{¶ 7}     R.L.'s first two assignments of error relate to the denial of his motion to suppress.

APPELLANT'S MOTION TO SUPPRESS WAS IMPROPERLY OVERRULED BECAUSE HIS INCRIMINATING STATEMENTS WERE OBTAINED DURING A CUSTODIAL INTERROGATION WITHOUT BEING AFFORDED MIRANDA WARNINGS.

APPELLANT'S MOTION TO SUPPRESS WAS IMPROPERLY OVERRULED BECAUSE HIS STATEMENTS WERE MADE INVOLUNTARILY.

{¶ 8}   R.L. contends that his statements to the police were made without the benefit of *Miranda* warnings, although he was in custody, and that his statements were not voluntarily made.   He asserts that the trial court erred in denying his motion to suppress the

statements.

{¶ 9} In ruling on a motion to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994); *State v. Knisley*, 2d Dist. Montgomery No. 22897, 2010-Ohio-116, ¶ 30. Accordingly, when we review suppression decisions, we must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Retherford* at 592. "Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 10} At the suppression hearing, Police Officer Kim Delong testified about the events of July 30, 2013, when she responded to an apartment complex in her jurisdiction. She initially responded to the area on a different case but, after she arrived, she became embroiled in a conflict involving the parties to this case. R.L.'s parents were present, claiming that he had been assaulted by his aunt ("Aunt"), and Aunt claimed that R.L. had sexually assaulted her daughter, D.G.

{¶ 11} Because many people were nearby, Police Officer Delong asked R.L. if he would like to speak with her more privately, due to the "sensitive topic." When R.L. answered affirmatively, Delong made eye contact with R.L.'s mother, who gestured in a manner that indicated to Delong that she consented to the conversation. Delong walked a short distance away with R.L., where they had a conversation that lasted approximately 30 minutes and covered both the alleged assault by Aunt on R.L. and R.L.'s alleged assault on D.G. According to Delong, she and R.L. were standing approximately 15 to 20 feet away

from R.L.'s mother during this conversation. They stood in front of Delong's cruiser, but R.L. was never handcuffed or placed inside the cruiser.

{¶ 12} Delong testified that the conversation was not "adversarial," commenting that "he's nine" and that she brought the conversation "down to [an] age appropriate" level. She did, however, "challenge" R.L. on his version of events when his statements were inconsistent with other facts known to her at that time.

{¶ 13} According to Delong's testimony at the suppression hearing, the incident began when R.L.'s aunt learned from R.L. that police were allegedly looking for people with "weed" in the apartment complex; Aunt, afraid that her 18-year-old son, "Cousin," might get in trouble, left the apartment to look for him, and R.L. left with her. However, R.L. returned to the apartment, where D.G. had been left alone, before Aunt did. The parties dispute what happened while R.L. was alone in the apartment with D.G.

{¶ 14} Recounting her conversation with R.L., Officer Delong testified that he had provided a very detailed recollection of the events preceding his own return to the apartment and after Aunt returned to the apartment, but he told several different stories about what had happened in the apartment in between, at the time of the alleged assault. In his first account to Delong, R.L. claimed that he went back into the apartment to spend time with Cousin (the victim's brother) and Cousin's friends. DeLong expressed doubt about this version of events, because she knew from other witnesses that Cousin and his friends had not been in the apartment at that time. R.L. then claimed that, when he was in the apartment, he had watched television on the couch while D.G. stayed in her room, and he had no contact with her. Next, R.L. stated to Delong that Cousin and his friends had made him (R.L.) take

D.G.'s diaper off, and then Cousin had done "nasty things" to D.G. in her bedroom, which R.L. observed from the couch. (Delong noted in her testimony that it was not physically possible to see into D.G.'s bedroom from the couch in the main room of the apartment, as R.L. claimed he had done.) R.L. also stated that Cousin had taken D.G.'s diaper off and had "put his thing * * * in her butt." Finally, R.L. stated that he could not remember what had happened when he returned to the apartment. DeLong testified that R.L. gave a detailed account of the activities "prior to him being in the apartment alone with [D.G.]; he was very detailed after [Aunt] walked in and saw what she saw; but the part in the middle where he was upstairs with [D.G.] by himself, he told me he couldn't remember."

{¶ 15}  After Delong and R.L. had been talking for about 30 minutes, R.L.'s mother ("Mother") approached them.  When R.L. and Delong told Mother that R.L. did not remember some of the events, Mother "barked" at R.L., told him that he did remember, and encouraged R.L. to be honest with Delong.  Delong testified that Mother was not rude or disrespectful to her and did not seem upset that Delong had talked with R.L.

{¶ 16}  On cross-examination, Delong stated that she had not inquired of R.L. whether he had previously dealt with police officers, that she had not informed him of his *Miranda* rights during their conversation, and that he had not been in custody during their conversation.  R.L. was released to Mother when the conversation ended.  Delong acknowledged that, when she had asked to speak with R.L., she had not specifically stated whether she intended to talk with him about the alleged assault (on him by Aunt), the alleged rape of D.G., or both.

{¶ 17}  "It is well-settled that many constitutional protections enjoyed by adults also

apply to juveniles. One such constitutional protection is the privilege against self-incrimination. *See In re Gault* (1967), 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527. Under the Fifth Amendment to the United States Constitution, no person shall be compelled to be a witness against himself. In order to ensure that this right is protected, statements resulting from custodial interrogations are admissible only after a showing that the procedural safeguards have been followed. *Miranda v. Arizona* (1966), 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694." *In re Haubeil*, 4th Dist. Ross No. 01CA2631, 2002-Ohio-4095, ¶ 9.

{¶ 18} Police are not required to give *Miranda* warnings to every person they question, even if the person being questioned is a suspect. *State v. Biros,* 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997)*; State v. Hatten*, 186 Ohio App.3d 286, 2010-Ohio-499, 927 N.E.2d 632, ¶ 49 (2d Dist.). *Miranda* warnings are required only for custodial interrogations. *Biros* at 440. *Miranda* defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* at 444. "The ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). The inquiry whether a person is subject to custodial interrogation focuses upon how a reasonable person in the suspect's position would have understood the situation. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). The subjective views of the interviewing officer and the suspect are immaterial to the determination of whether a custodial interrogation was conducted.

*Stansbury v. California*, 511 U.S. 318, 323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *Hatten* at ¶ 50.

{¶ 19} Officer Delong's interaction with R.L. did not have any indicia of a custodial interrogation. Although Mother did not participate in the conversation, she consented to it, she was in the immediate vicinity, and she was permitted to enter the conversation when she sought to do so. She was visible to R.L. throughout the conversation. Moreover, the conversation occurred outside, R.L. was not confined or constrained in any way, and the trial court credited DeLong's testimony that R.L. had desired to speak with her "privately." After the questioning, R.L. was not placed under arrest and was allowed to go home with his parents. There was no basis to conclude that R.L. had been taken into custody or otherwise deprived of his freedom during the conversation; therefore, the trial court reasonably concluded that R.L. had not been in custody when his statements were made. The statements therefore were not subject to suppression under *Miranda*.

{¶ 20} R.L. also argues that his statements should have been suppressed because they were not voluntarily made.

{¶ 21} Separate from the issue of compliance with *Miranda* in custodial interrogations is the voluntariness of the pretrial statement. *In re N.J.M.*, 12th Dist. Warren No. CA2010-03-026, 2010-Ohio-5526, ¶ 18, citing *State v. Chase*, 55 Ohio St.2d 237, 246, 378 N.E.2d 1064 (1978); *State v. Patterson*, 2d Dist. Montgomery No. 20977, 2006-Ohio-1422, ¶ 21. "Even where *Miranda* warnings are not required, 'a confession may [still] be involuntary [and excludable] if on the totality of the circumstances, the defendant's will was overcome by the circumstances surrounding the giving of the confession.' "

(Bracketed material in original). *In re N.J.M.* at ¶ 18, citing *State v. Fille*, 12th Dist. Clermont No. CA2001-08-066, 2002-Ohio-3879, ¶ 15 and *Dickerson v. United States*, 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000); *Patterson* at ¶ 21.  Because of R.L.'s youth, the voluntariness of his statements must be examined closely.

{¶ 22}   The burden is on the prosecution to prove by a preponderance of the evidence that a defendant's confession is voluntary.  *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *State v. Knight*, 2d Dist. Clark No. 04-CA-35, 2008-Ohio-4926, ¶ 107; *State v. Phillips*, 2d Dist. Montgomery No. 18049, 2000 WL 1133249, * 3 (Aug. 11, 2000).   The totality of the circumstances analysis is triggered by evidence of police coercion.  *State v. Clark*, 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988); *Phillips* at * 3.   Coercive police activity is a necessary predicate to the finding that a suspect involuntarily confessed. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

{¶ 23}   Although we recognize that R.L. did not "confess" to any crime, the inconsistency of his account of the events surrounding the alleged rape was used by the State as evidence of his guilt.   Thus, we apply the same standard to our analysis.

{¶ 24}   As in other cases involving involuntary statements, a court must look at the totality of circumstances in deciding whether a juvenile's pretrial statement was involuntarily induced. These include "the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." (Internal quotations and citations omitted.) *State v. Frazier*, 115 Ohio St.3d 139, 873 N.E.2d 1263, 2007-Ohio-5048, ¶ 112. Also, "special caution" should be given to a review of a juvenile's pretrial statement,

admission or confession. *In re N.J.M.* at ¶ 19, citing *In re Gault*, 387 U.S. 1, 45, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). *See also State v. Davis*, 56 Ohio St.2d 51, 54, 381 N.E.2d 641 (1978) (finding that "scrupulous attention" must be given regarding the issue of voluntariness in the case of a minor); *In re Goins*, 137 Ohio App.3d 158, 162, 738 N.E.2d 385 *(*12th Dist.1999) (noting that waivers in the juvenile context require "close scrutiny" since their validity is affected by age, emotional stability and mental capacity).

**{¶ 25}** Care must be taken to make sure that the juvenile's statement was not the product of coercion or suggestion and that it was not elicited due to the juvenile's ignorance of his rights or as the result of adolescent fantasy, fright, or despair. *In re Marvin M*., 383 Ill. App. 3d 693, 705, 890 N.E.2d 984 (2008), citing *In re G.O.*, 191 Ill.2d 37, 54, 727 N.E.2d 1003 (2000). Particularly with regard to juveniles, appropriate additional factors in considering the totality-of-the-circumstances are whether the juvenile, either before or during the questioning, had the opportunity to consult with an adult interested in his welfare; whether the police prevented the juvenile from consulting with a concerned adult; whether the police frustrated an adult's attempt to confer with the juvenile, and the presence of police trickery and deceit. *Id.*, citing *People v. Minniti*, 373 Ill.App.3d 55, 68, 867 N.E.2d 1237 (2007). But no one factor is per se coercive without reference to its factual context; coercion can only be defined relative to the characteristics of the individual. *People v. Weiss*, 102 Misc. 2d 830, 833-34, 424 N.Y.S.2d 844, 847 (N.Y.Sup.Ct. 1980), citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1972).

**{¶ 26}** Although R.L.'s motion to suppress lists many factors that *may* weigh on the decision whether statements were voluntarily made, such as "coercive police activity," the

length and intensity of the interrogation, and the existence of physical deprivation and inducement, the evidence does not establish that any of these factors was present in this case. R.L. was questioned for 30 minutes, but there was no indication that his statements had been coerced or involved physical deprivation. As stated above, his parents were not directly involved in the conversation with Officer Delong, but they were nearby and were not purposefully excluded from the conversation. R.L.'s parents were not prevented from conferring with him, or vice versa, and no "police trickery" or deceit was alleged or shown. No evidence was developed about R.L.'s experience, if any, with the police.

{¶ 27} If we were to conclude, under the facts of this case, that R.L.'s statements to the police were involuntary, that conclusion would necessarily be based solely on his age, because there are no other factors upon which to base such a finding. In other words, we would essentially hold that, as a matter of law, a juvenile of the age of nine cannot, by virtue of his or her age, have a voluntary interaction with the police, even with a parent's consent. The determination whether such a per se rule is appropriate in Ohio should be left to the legislature or the Supreme Court.

{¶ 28} Under the facts of this case, the police did not act coercively, employ deprivation or inducement, play on R.L.'s fears or inexperience, or prevent the involvement of his parents while he was being questioned. He also was not in custody or otherwise isolated from his parents, except that R.L. and his mother consented to Officer Delong's having the conversation with R.L. a short distance away due to the sensitive nature of the matters to be discussed. Even assuming that R.L. had no prior experience with law enforcement or the criminal justice system, and taking into account his youth, we find no

basis to conclude that the trial court erred in concluding that his statements were voluntarily made.

**{¶ 29}** The first and second assignments of error are overruled.

**{¶ 30}** R.L.'s third and fourth assignments of error state:

APPELLANT'S ADJUDICATION WAS BASED UPON INSUFFICIENT EVIDENCE PRESENTED AT TRIAL.

APPELLANT'S ADJUDICATION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶ 31}** R.L. asserts that his convictions were supported by insufficient evidence and were against the manifest weight of the evidence.

**{¶ 32}** A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to sustain the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist.

Montgomery No. 22581, 2009-Ohio-525, ¶ 12.

{¶ 33} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson,* 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.* The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 34} R.C. 2907.02(A)(1)(c), the offense alleged in the complaint against R.L., proscribes rape, as follows: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * *, when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age." "Sexual conduct" is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).

{¶ 35} R.L. contends that the State failed to establish the elements of sexual conduct, particularly, that any penetration occurred which would constitute "intercourse" or "insertion."

{¶ 36} At the adjudicatory hearing, the State presented the testimony of one the D.G.'s teachers, Aunt, and Officer Delong. The teacher and Aunt testified to D.G.'s physical and mental condition and disabilities, including cerebral palsy, "MRDD," and behavioral problems. The teacher stated that D.G. was "multiply disabled" and nonverbal, with severe cognitive delays and limited motor skills. D.G. uses "very limited words" and otherwise communicates through limited sign language and picture cards. D.G.'s education focused on such goals as "completing a task without aggression, expressing herself without aggression." The teacher stated that D.G. functions at the level of a 24- to 26-month-old child. She can walk and move around, but becomes aggressive when she does not want to do something, and can be overwhelmed by noises and sights. D.G. does not care for her own hygiene, wears a diaper, and does not dress herself. Both Aunt and the teacher testified that D.G. does not like to be touched.

{¶ 37} Aunt testified that she lives in an apartment in a large apartment complex with her daughter, D.G., age 20, and her son, Cousin, age 18. On July 30, 2013, Aunt's nephew, R.L., had been staying with her for four days, because his parents did not have any food. R.L. had stayed with his aunt on prior occasions. Cousin worked in the apartment complex office, and he was in and out of the apartment throughout the day. Aunt, R.L. and D.G. were home all day.

{¶ 38} In the afternoon, R.L. asked if he could play outside, and Aunt began to

cook a meal for D.G. R.L. returned from playing at a nearby park and reported to Aunt that police officers were outside and that a group of boys smoking "weed" was about to get arrested. Apparently fearing that Cousin might get in trouble with the police, Aunt left the apartment with R.L. to look for Cousin.

{¶ 39} R.L. returned to the apartment after only a few minutes; Aunt gave varying accounts about how long she was gone from the apartment. In her statements to the police that day, she stated that she had been gone only a few minutes, but at trial she testified that she was gone 20-25 minutes. Aunt explained the discrepancy by citing the chaos of the "crime scene," her need to get her daughter to the hospital, and her fear that she might get in trouble for leaving D.G. alone. In any event, when she returned to the apartment, she called out for R.L. and got no response. She walked down the apartment hallway toward D.G.'s room and began to hear a "certain sound" that D.G. makes when "something is wrong;" Aunt described the sound as "bee bee bee." Aunt testified that, when she entered D.G.'s room, R.L. "had my daughter in a doggie position. Her diaper is completely off. Her shorts is down. His clothes is completely off. His underwear is down to his legs. And when I walked in, he's pulling out of her." Aunt explained that the "doggie position" meant that D.G. was "bent over her bed." Aunt testified that R.L. had been "pulling out," although she could not tell whether R.L.'s penis had been in D.G.'s vagina or anus; his penis was erect, "fully-on hard, no bigger than my middle finger." Aunt acknowledged that D.G. had been bent over toward the bedroom door, so that she (Aunt) could not see the point of penetration, but Aunt was certain that R.L. had penetrated D.G. and was "pulling out" when she came into the room.

{¶ 40} After Aunt walked into the room, R.L. began apologizing, and Aunt "lost it," yelling, crying, screaming, and "whooping" R.L. Aunt tried to call her parents, R.L.'s grandparents, to pick R.L. up, then attempted to call the police, but R.L. knocked the phone out of her hand repeatedly, stating that he did not want to go home. Cousin also came home around this time with some friends; when he heard from Aunt what had happened, his friends had to restrain him from assaulting R.L. The grandparents came to the apartment and took R.L. to his parents' home. Aunt never completed a call to the police.

{¶ 41} Aunt denied that Cousin had ever been accused of sexually inappropriate conduct toward R.L.

{¶ 42} Officer Delong testified that, when R.L. got to his parents' home, the parents became upset at his injuries and returned to the apartment complex, with R.L., to confront Aunt. Delong testified, as she had at the suppression hearing, to Mother's consent to Delong's interview with R.L., R.L.'s detailed accounts of the events before and after his time in the apartment with D.G., and R.L.'s multiple inconsistent accounts of what had happened inside the apartment. As described in the suppression hearing testimony, Delong recounted R.L.'s claims that he had watched television in a different room from D.G. and that Cousin and his friends had assaulted D.G., with or without making him take her diaper off. According to Delong, R.L.'s demeanor during their conversation varied from "matter of fact" to "lackadaisical" to "distracted." He claimed not to know why Aunt had "whooped" him.

{¶ 43} R.L.'s mother testified for the defense. Mother stated that R.L. was in the 4th grade and age 10 at the time of the hearing (age 9 at the time of the incident), that he had learning disabilities, including ADHD, and that he had an IEP at school. She further

testified that R.L. sometimes had difficulty recalling events and that he had not yet reached puberty at the time of this incident.  Mother testified that she called the police on July 30, 2013, when she saw contusions and bruises on R.L.'s face, which he said had been inflicted by Aunt.   Mother also testified that there had been an allegation of "sexual inappropriateness" between Cousin and R.L. when R.L. was 3 years old, and that she (Mother) had discussed this incident with Aunt.

{¶ 44}    The trial court found R.L. responsible for the commission of rape, as alleged in the complaint.

{¶ 45}    Aunt's testimony, if believed, provided sufficient evidence to support the trial court's adjudication.  Based on what she had witnessed, Aunt expressed no doubt that R.L. had penetrated D.G., and this was a reasonable inference based on his position and the erectness (according to Aunt) of his penis, which he seemed to be withdrawing from D.G.'s vagina or anus as Aunt entered the room.  The trial court did not abuse its discretion in crediting this testimony.  The discrepancies between Aunt's original statement to the police and her trial testimony as to he length of time for which she left the apartment did not compel the court to reject her testimony in its entirety; some confusion over the details was understandable in such a situation, and Aunt offered explanations for those discrepancies. Moreover, there was no credible evidence that Cousin had been the perpetrator of the alleged rape, notwithstanding Mother's claim that Cousin had behaved inappropriately with R.L. many years earlier.  The evidence supported the trial court's judgment, and its disposition was not against the manifest weight of the evidence.

{¶ 46}    The third and fourth assignments of error are overruled.

**{¶ 47}** The judgment of the trial court will be affirmed.

. . . . . . . . . .

FAIN, J. and DONOVAN, J., concur.

Copies mailed to:

Tiffany C. Allen
Bradley S. Baldwin
Hon. Anthony Capizzi