[Cite as *State v. Harper*, 2018-Ohio-2581.]

IN THE COURT OF APPEALS

ELEVENTH APPELLATE DISTRICT

TRUMBULL COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| | | **CASE NO. 2017-T-0096** |
| - vs - | : | |
| ARTHUR ALBERT HARPER, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Trumbull County Court of Common Pleas.
Case No. 2015 CR 01008.

Judgment: Affirmed.

*Dennis Watkins*, Trumbull County Prosecutor; *Diane Barber* and *Ashleigh Musick*, Assistant Prosecutors, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481-1092 (For Plaintiff-Appellee).

*Stephen A. Turner*, Turner, May & Shepherd, 185 High Street, N.E., Warren, OH 44481-1219 (For Defendant-Appellant).

TIMOTHY P. CANNON, J.

{¶1} Appellant, Arthur Albert Harper, appeals the September 26, 2017 sentencing entry of the Trumbull County Court of Common Pleas. The trial court's judgment is affirmed for the following reasons.

{¶2} On January 5, 2016, appellant was indicted by the Trumbull County Grand Jury on the following charges: Count 1: murder, in violation of R.C. 2903.02(B); Count 2: endangering children, a second-degree felony in violation of R.C. 2919.22(B)(1) and

(E)(2)(d); and Count 3: felonious assault, a second-degree felony in violation of R.C. 2903.11(A)(1) and (D)(1)(a).

{¶3} Appellant was appointed counsel, and the matter was set for a jury trial.

{¶4} On April 11, 2016, counsel for appellant filed a "Suggestion of Incompetence to Stand Trial." After appellant refused to participate in a competency evaluation, the trial court ordered appellant to undergo a 20-day inpatient evaluation. Appellant was found incapable of assisting in his own defense. The trial court ordered he undergo up to four months of continuing evaluation and treatment. Counsel for appellant filed a second motion for a competency evaluation on December 12, 2016. After reviewing the reports of two different doctors, the trial court determined appellant was capable of understanding the nature and objectives of the proceedings against him and of assisting in his own defense.

{¶5} On March 10, 2017, appellant filed a motion to suppress evidence and requested an evidentiary hearing. Appellant moved the court to suppress the statements he gave police when they interviewed him on November 29 and December 2, 2015. Appellant argued the statements were involuntary and that his *Miranda* waivers were not secured knowingly, voluntarily, and intelligently. At a hearing on the motion, appellee, the state of Ohio, presented the testimony of Detective Nicholas Carney, in addition to the recordings from the interviews. Appellant filed a post-hearing brief on May 24, 2017. The state filed a brief on June 9, 2017. On August 22, 2017, the trial court overruled appellant's motion to suppress.

{¶6} The matter proceeded to a jury trial on August 28, 2017. The following is a summary of the relevant testimony presented at trial.

{¶7}  Judith Owens testified that she and appellant met online around Thanksgiving 2014.  In June 2015, Judith travelled to New York with her three-year-old son, R.C., to meet appellant.  Thereafter, appellant moved into Judith's home at 591 High Street, N.E., Warren, Ohio, where Judith lived with R.C. and her 22-year-old niece.  The romantic relationship between Judith and appellant progressed, and although they were never legally married, they held themselves out to others as married.  Judith testified that R.C. referred to appellant as "daddy."

{¶8}  On November 28, 2015, Judith left R.C. with appellant when she went to work.  Judith checked her phone during her lunch break.  Appellant had sent her two text messages.  The first, received on her phone at 5:34 p.m., was a picture of appellant and R.C., stating they loved her.  Judith testified the second message, received at 6:26 p.m., stated "Hun, there's something wrong with the baby."  Judith texted appellant back at 6:36 p.m., asking what was wrong.  Judith testified she did not wait for a reply and called appellant, who told her that R.C. was unresponsive.  Judith instructed appellant to call 911.

{¶9}  Judith testified she left work and went home, where her driveway was blocked by three police cars and an ambulance.  She was told her son was in cardiac arrest, but they had revived his heartbeat and were transporting him to Trumbull Memorial Hospital.

{¶10} Judith testified she questioned appellant about what had happened.  He told her that after he put R.C. down for a nap, he went downstairs to make dinner.  He heard a "thump" and, upon checking on R.C., found him lying on the floor.

{¶11} From Trumbull Memorial Hospital, R.C. was transported to Rainbow Babies and Children's Hospital. Shortly after they arrived there, Judith was notified by a doctor that R.C. was "brain dead." Judith testified that appellant stayed at the hospital with her.

{¶12} On November 29, 2015, Judith and appellant were questioned by the police in a conference room. Judith was aware her interview was recorded, and she gave the police permission to search her house.

{¶13} Doctors performed two separate tests on R.C. to check for brain activity, and both tests revealed R.C. had no brain activity. Judith testified her son was officially pronounced "brain dead" on November 30, 2015.

{¶14} On the morning of December 2, 2015, the police arrived at Judith's home and took appellant to the police station for questioning. Later, Judith also went to the police station where she spoke with Detective Carney. She left after the interview, but the detective called her and requested she come back. When she came back, she went into the interview room to speak with appellant. He explained what had happened to R.C., telling Judith he was playing with R.C. and that R.C.'s "head was in the wrong position. * * * And something went wrong." Judith testified appellant did not tell her exactly what he had done to R.C. Judith explained she was upset and, after she had calmed down, left the police station.

{¶15} Dispatcher Thomas Watson of Trumbull County 911 Dispatch Center testified that on November 28, 2015, at approximately 6:37 p.m., he received an emergency call for 591 High Street, N.E. A recording of the call was played for the jury. The caller stated his stepson was in his room, lying down, when the caller heard a

4

"thump." The child appeared "very unresponsive." When asked whether the child was breathing, the caller responded: "As far as I know."

{¶16} Patrolman Lance Adkins testified that on November 28, 2015, he was dispatched to a call for an unresponsive child at 591 High Street, N.E. Officer Adkins arrived on the scene at approximately 6:42 p.m. Appellant was standing by the door. Officer Adkins testified that when he walked into the house, he saw a younger white male lying on the couch in the living room. The boy was unresponsive, had no pulse, and there was no visible rise and fall of his chest. Officers moved the boy's body to the ground. When they were unable to arouse him, Officer Adkins administered CPR until an ambulance arrived.

{¶17} Officer Adkins testified that when the ambulances arrived at the scene, he carried the child out to the ambulance crews. He was notified by his Sergeant that both crews were needed in the back of the first ambulance to work on the child, so Officer Adkins drove the second ambulance to Trumbull Memorial Hospital.

{¶18} Detective Jolene Marcello testified that on November 29, 2015, she assisted in the search of 591 High Street, N.E. She helped process the scene and took photographs. Upon being shown the photographs, Detective Marcello testified one of them was of the child's bed, which was a mattress on top of a box spring. There was no bed frame, and the box spring was on the floor. Another photograph showed the measurement from the floor to the top of the mattress was 17 ½ inches. Those photographs were entered into evidence.

{¶19} Detective Nicholas Carney testified he is a member of the Trumbull County Child Serious Injury and Homicide Task Force. On November 29, 2015, he was notified

regarding R.C.'s condition. Detective Carney contacted a doctor at Rainbow Babies and Children's Hospital, who reported R.C. was not going to survive his injuries, and the incident appeared to be a homicide.

{¶20} Detective Carney testified he went to the hospital with Detective Laprocina. They were directed to Judith and appellant, who were identified as R.C.'s parents. Detective Carney interviewed Judith and appellant, individually, in a conference room. Detective Laprocina was present for both interviews.

{¶21} Detective Carney testified that Judith informed the detectives she was at work when she learned from appellant that R.C. was unresponsive. She provided the detectives with her cell phone and showed them the text messages she received from appellant.

{¶22} Detective Carney testified that appellant also agreed to speak with him. Detective Carney used an audio recording device to record the interview. Detective Carney explained that he reviewed the standard Warren City Police Department Constitutional Rights form with appellant. Appellant initialed next to each line, indicating he understood his rights, and signed at the bottom of the form, indicating he understood the entire form. After appellant signed the form, Detective Carney proceeded with the interview.

{¶23} A recording of the November 29, 2015 interview was played for the jury. The recording corroborated Detective Carney's testimony. The jury also heard appellant confirm he and R.C. were alone at the house when the incident occurred. Appellant gave the detectives the same explanation he had given Judith—that he heard a "thump" while making dinner and then found R.C. lying on the floor.

6

**{¶24}** Detective Carney testified that he and Detective Laprocina left the hospital and went to 591 High Street, N.E. to walk through the house, specifically R.C.'s bedroom. They continued their investigation and confirmed Judith's timeline of events with her employer. They also interviewed other people in connection with the case. Detective Carney testified he obtained an arrest warrant for appellant for endangering children, a third-degree felony.

**{¶25}** On the morning of December 2, 2015, Detective Carney and two other detectives went to 591 High Street, N.E. and arrested appellant. Detective Carney testified that appellant was not handcuffed and was placed in the front seat of the police cruiser.

**{¶26}** Appellant was taken to the police station and placed in an interview room. Detective Carney testified there was a large sign in the room that stated everything in the room was being video and audio recorded. Prior to starting the interview, appellant was given a cup of coffee, and he used the restroom. Detective Carney advised appellant of his constitutional rights by reviewing the rights form. Appellant initialed and signed the form.

**{¶27}** A video recording of the December 2, 2015 interview was played for the jury. The recording corroborated Detective Carney's testimony. In the recording, Detective Carney notified appellant he was under arrest. He asked appellant whether he understood what was going on, and appellant confirmed that he did. Detective Carney reviewed the constitutional rights form with appellant. Detective Carney read each right aloud to appellant. Detective Carney informed appellant that he could invoke his rights at any time and explained that appellant was waiving his rights and agreeing to make a

7

statement. Appellant confirmed his understanding of the contents of the form by initialing next to each constitutional right and signing at the bottom of the form.

{¶28} In the recording, the jury also saw that appellant initially maintained his story that he heard a "thump" and then found R.C. lying on the floor. Detective Carney presented appellant with various facts that contradicted his claim. Detective Carney informed appellant that the preliminary autopsy report stated R.C. had suffered three blunt force traumas to his head. Detective Carney asserted the severity of the injuries was inconsistent with falling out of bed. Detective Carney further explained he had rolled an egg off R.C.'s bed, and the egg did not crack.

{¶29} After continually asserting he was telling the truth, appellant eventually stated he had made a mistake. Appellant explained that he and R.C. would always "play around" after naps. On the date of the incident, R.C. woke up from a nap, and appellant and R.C. were playing. Appellant performed a "piledriver" maneuver in R.C.'s bedroom. Appellant explained he held R.C. upside down by his legs while R.C.'s head was held in place between appellant's thighs. While holding R.C.'s body in this manner, appellant fell backwards onto his buttocks. Appellant explained that at the time of the incident, R.C.'s head was too low, and when appellant fell back, R.C.'s head hit the floor. Although appellant initially stated R.C.'s head hit the floor only once, after being pressed by Detective Carney, appellant indicated it could have been "4, 5, or 6" times. Appellant explained that after hitting his head, R.C. began shaking and then became unresponsive. Appellant explained that he and R.C. had performed the same maneuver on several other occasions. Appellant stated multiple times during the interview that it was a mistake, that R.C.'s head was too low.

{¶30} A second video, in which appellant reenacted the "piledriver" maneuver for the detectives, was also played for the jury. Appellant demonstrated the "piledriver" using a baby doll. The jury saw appellant, a large adult male, holding the baby doll upside down by its legs with the front of its body facing outward. The baby doll's head was held in place between appellant's thighs. While holding the doll in that position, appellant fell back onto his buttocks. Appellant's fall to the ground is audible. In the video, appellant explained to detectives that a "piledriver" is a wrestling maneuver and that it was the same maneuver he did with R.C.

{¶31} After the jury watched those videos, Detective Carney testified to his assessment of appellant's height and weight at the time of the interview, stating appellant was "6'1"; 6'2", and about 240 * * * I am 6 foot even and at the time of that interview, I weighed around 220 pounds * * * And, I mean, it's plain to see he's much larger than me in the interview." Detective Carney also testified regarding the various interview techniques he used during the interview. Detective Carney explained he told appellant several lies in an attempt to get appellant to tell the truth, which included that he had rolled an egg off R.C.'s bed.

{¶32} Doctor Joseph Felo testified he is a forensic pathologist and the Chief Deputy Medical Examiner for Cuyahoga County. He supervised the autopsy of R.C.'s body performed by his fellow, Dr. Patrick Hansma. Dr. Felo independently concluded that "the death of [R.C.] is the result of blunt force injuries of the head and neck with brain and spinal injuries" and that "his manner of death is a homicide."

{¶33} Measurements were taken of R.C.'s body when it was first received in the medical examiner's office. R.C. was 38 inches in length and weighed 37 pounds.

{¶34} Referencing several photographs taken of the body during the autopsy, Dr. Felo testified regarding the injuries to the body. Dr. Felo explained R.C. had distinct hemorrhages to the left and right sides of his head and to the top of his head. The hemorrhages indicated R.C. was subjected to direct blows or blunt force traumas to those portions of his head. Dr. Felo explained a direct blow could have been caused either from an object striking R.C.'s head or from R.C.'s head striking an object. Dr. Felo also concluded that there was "more force applied to the right side of the brain causing more prominent trauma to that surface than the left surface."

{¶35} Dr. Felo testified that there were also hemorrhages along R.C.'s spinal cord from "transmitted force." He explained that the impact to the top of the skull "pushes the force to the path of least resistance and in this case, essentially sheers or vibrates the spinal cord causing those hemorrhages." Those hemorrhages went to "the nerves that are vital for the body, meaning they supply the diaphragm to breathe, the heart to beat, the temperature regulations so that people don't develop high or low temperatures." Dr. Felo explained that trauma to the nerves will essentially short circuit what those nerves are designed to do.

{¶36} Dr. Felo testified the force to the top of R.C.'s head was so great that it caused hemorrhages in the eye in addition to retinal tearing. Due to the severe nature and position of the injuries in R.C.'s neck, Dr. Felo testified he would expect "some changes in alertness * * * there would be some lack of vision, lack of understanding, this child would be dazed and confused at a minimum. But with this trauma here, essentially he would not be breathing as well, somewhat limp." He testified that the onset of those symptoms would have been immediate, and R.C. would have suffered immediate loss of

10

consciousness and difficulty breathing. He also stated that an individual may shake due to brain injury.

**{¶37}** Dr. Felo testified the impacts to R.C.'s head could not have been imposed from a singular "piledriver" maneuver. He further testified the manner of R.C.'s death was ruled a "homicide," which is one of the five classifications to assign a death. A "homicide" does not necessarily equate with murder but means someone's death occurred because of the action or inaction of another person.

**{¶38}** On August 30, 2017, the jury returned guilty verdicts on all counts. With regard to endangering children, the jury found appellant's abuse of R.C. resulted in serious physical harm to R.C.

**{¶39}** After appellant and the state both filed sentencing memoranda, appellant's sentencing hearing was held on September 25, 2017. Count 2 and Count 3 merged with Count 1 for sentencing purposes. Appellant was ordered to serve an indefinite prison term of 15 years to life on Count 1. The sentencing entry was filed on September 26, 2017.

**{¶40}** Appellant noticed a timely appeal. On appeal, he asserts three assignments of error.

**{¶41}** Appellant's first assignment of error states:

**{¶42}** "The trial court erred when it failed to suppress the incriminating statements of the appellant."

**{¶43}** When the admissibility of a confession has been challenged in a motion to suppress, the prosecution bears the burden of introducing evidence into the record and proving by a preponderance of the evidence that the confession was given voluntarily.

*State v. Jett*, 11th Dist. Portage No. 97-P-0023, 1998 WL 258166, *2 (Mar. 31, 1998) (citations omitted). Because the question of voluntariness is a question of law, "an appellate court must arrive at its own conclusion as to whether a given confession was voluntary by reviewing the facts of the case." *Id.*, citing *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) and *State v. Booher*, 54 Ohio App.3d 1, 7 (3d Dist.1988).

{¶44} The Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution guarantee that no person shall be compelled in any criminal case to be a witness against himself. To protect this right, statements made during custodial interrogations are admissible only after a showing that the procedural safeguards articulated in *Miranda v. Arizona*, 384 U.S. 436, 444 (1966) were followed. *See In re R.L.*, 2d Dist. Montgomery No. 26232, 2014-Ohio-5065, ¶17. "*Miranda* required a prescribed warning of rights that must precede custodial interrogation, and further held that when those rights are waived by the suspect in custody, any subsequent statement the suspect makes is presumed to be voluntary." *State v. Porter*, 2d Dist. Montgomery No. 22369, 2008-Ohio-4627, ¶13, citing *Miranda*, *supra*, at 444-445.

> The *Miranda* presumption applies to the conditions inherent in custodial interrogation that compel the suspect to confess. It does not extend to any *actual coercion* police might engage in, and the Due Process Clause continues to require an inquiry separate from custody considerations and compliance with *Miranda* regarding whether a suspect's will was overborne by the circumstances surrounding his confession.

*Id.* at ¶14, citing *Dickerson v. United States*, 530 U.S. 428 (2000) (emphasis added). If a suspect's "will has been overborne and his capacity for self-determination critically impaired" then his confession is considered involuntary, and the use of his statements

12

against him violates due process. *Jett*, *supra*, at *3, quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961).

**{¶45}** Whether an individual knowingly, voluntarily, and intelligently waived his *Miranda* rights and whether the individual made a statement voluntarily are two separate issues. *State v. Eley*, 77 Ohio St.3d 174, 178 (1996). However, the same test, i.e., whether the action was voluntary under the totality of the circumstances, is used to determine both. *Id.*, citing *State v. Clark*, 38 Ohio St.3d 252, 261 (1988). The totality of the circumstances include """the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.""" *State v. Young*, 11th Dist. Ashtabula No. 2002-A-0093, 2004-Ohio-342, ¶11, quoting *State v. Twyford*, 94 Ohio St.3d 340, 360 (2002), quoting *State v. Edwards*, 49 Ohio St.2d 31 (1976), paragraph two of the syllabus. In order to trigger an analysis of the totality of the circumstances, there must be some evidence of police coercion. *In re R.L.*, *supra*, at ¶22, citing *Clark*, *supra*, at 261.

**{¶46}** Appellant's arguments under this assignment of error pertain to Detective Carney's interview of appellant on December 2, 2015. Appellant does not argue that his *Miranda* waiver on that date was given involuntarily. Instead, appellant argues Detective Carney invoked several psychologically coercive tactics during the interview, including references to religion and appellant's "strong emotional attachment" to R.C.; suggestions that appellant needed to clear his conscience; and lies about rolling an egg off R.C.'s bed. Appellant maintains these tactics were sufficient to overbear his will and coerced him into

13

admitting he performed the "piledriver" maneuver with R.C. Appellant maintains therefore, that his confession was involuntary.

{¶47} In support, appellant relies on *Williams v. Brewer*, 375 F.Supp. 170 (S.D. Iowa 1974) and *United States v. Tingle*, 658 F.2d 1332 (9th Cir.1981). Both of those cases, however, are distinguishable from the present case. Notably, in *Williams*, the defendant did not waive his *Miranda* rights, and both he and his attorneys indicated he wished to remain silent. The police had agreed not to speak with the defendant, and in spite of that agreement, repeatedly attempted to elicit a confession from the defendant by appealing to his known deep religious beliefs. *Williams*, *supra*, at 179-180. In *Tingle*, officers elicited a confession by threatening that if the defendant did not cooperate, she would not see her child for a long time. *Tingle*, *supra*, at 1336.

{¶48} Here, Detective Carney did not engage in coercive conduct. The tactics implemented by Detective Carney were used to urge appellant to tell the truth. Moreover, no threats were made, and appellant was not induced to confess to a crime. Instead, appellant essentially changed his statement about how the injuries to R.C. had occurred.

{¶49} Even if we had determined Detective Carney engaged in coercive conduct during the interview, the totality of circumstances support that appellant's statements were made voluntarily. During the December 2, 2015 interview, appellant was 43 years old. This interview was not his first encounter with law enforcement. On the morning of the interview, appellant had been placed under arrest. Prior to starting the interview, appellant was again informed that he was under arrest. Appellant was read his *Miranda* rights, he waived his rights, and he did not invoke his rights at any point during the interview. The entire interview was approximately 2 hours and 45 minutes, during which

14

breaks were taken. Throughout the interview, appellant was given multiple cups of coffee, was allowed to use the restroom, and was permitted to smoke in the interview room. Although he did raise his voice on several occasions, Detective Carney's tone was primarily cordial, and appellant engaged in conversation with him. These circumstances do not indicate appellant's will was overborne.

**{¶50}** After a review of the evidence presented by the state at the hearing on appellant's motion to suppress, we cannot say the trial court erred in determining that the state met its burden of proving by a preponderance of the evidence that appellant's statements during the December 2, 2015 interview were made voluntarily. Appellant's statements were therefore admissible.

**{¶51}** Appellant's first assignment of error is without merit.

**{¶52}** Appellant's second and third assignments of error pertain to the trial court's failure to instruct the jury on the lesser included offenses of involuntary manslaughter and reckless homicide. The assignments of error state:

> [2.] The trial court erred when it failed to instruct the jury as to the lesser included offense of involuntary manslaughter.

> [3.] The trial court erred when it failed to instruct the jury as to the lesser included offense of reckless homicide.

**{¶53}** Under his second assignment of error, appellant argues the trial court abused its discretion because it failed to articulate its reasoning for refusing to give the lesser included offense instruction on involuntary manslaughter.

**{¶54}** Under his third assignment of error, appellant argues the trial court acted arbitrarily and unreasonably when it determined the case did not merit a lesser included offense instruction on reckless homicide.

15

{¶55} Whether a particular offense should be submitted to the jury as a lesser included offense of the crime charged is a two-part inquiry. *State v. Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, ¶6. First, the trial court must "determine whether one offense is generally a lesser included offense of the charged offense." *Id.*, citing *State v. Kidder*, 32 Ohio St.3d 279, 281 (1987). "An offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense." *State v. Deem*, 40 Ohio St.3d 205 (1988), paragraph three of the syllabus.

{¶56} Second, "[t]he trial court *must* give an instruction on a lesser included offense if under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense." *State v. Wine*, 140 Ohio St.3d 409, 2014-Ohio-3948, ¶34 (emphasis added). Instruction on the lesser offense is required where the evidence presented at trial could "'reasonably support *both* an acquittal on the crime charged and a conviction upon the lesser included offense.'" *Id.* at ¶21, quoting *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph two of the syllabus (emphasis added). "'[T]he trial court must view the evidence in the light most favorable to the defendant.'" *Id.* at ¶21, quoting *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶37.

{¶57} Appellant argues we review the trial court's failure to instruct the jury on a lesser included offense for an abuse of discretion. In support, appellant cites to the Supreme Court of Ohio's statement in *Wine* that "[t]he law, the evidence presented, and

16

the discretion of the trial judge play a role in whether lesser-included-offense instructions are appropriate." *Id.* at ¶21. The *Wine* court, however, made clear that the trial court is *required* to give the instruction on a lesser included offense "when the facts warrant it." *Id.* at ¶20. The language in the *Wine* decision that suggests the trial court has some discretion whether to give a lesser included offense instruction appears limited to the trial court's assessment of the *reasonableness* of the evidence in support of conviction or acquittal.

**{¶58}** It is clear, however, that the trial court essentially engages in a sufficiency of the evidence analysis in determining whether to give a lesser-included-offense instruction. An analysis of the sufficiency of evidence is a legal analysis, not one subject to the discretion of the trial court. *See State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997) ("In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law."). If the evidence, viewed in the light most favorable to the defendant, is sufficient with respect to acquittal of the more serious offense and a finding of guilt on the lesser offense, *Wine requires* a lesser-included-offense instruction. *Wine*, *supra*, at ¶34. Accordingly, we review the trial court's decision with regard to the sufficiency necessary to give the instruction de novo as a matter of law and without deference to the trial court.

**{¶59}** At trial, appellant requested lesser-included-offense instructions to the charge of felony murder. Appellant requested the trial court instruct the jury on (1) involuntary manslaughter in violation of R.C. 2903.04(B) with reckless assault in violation of R.C. 2903.13(B) as the predicate offense and, (2) reckless homicide in violation of R.C. 2903.041.

17

{¶60} Appellant was convicted of felony murder in violation of R.C. 2903.02(B), which states: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 [voluntary manslaughter] or 2903.04 [involuntary manslaughter] of the Revised Code." The predicate felonies with which appellant was convicted were endangering children in violation of R.C. 2919.22(B)(1) and (E)(2)(d) and felonious assault in violation of R.C. 2903.11(A)(1) and (D)(1)(a).

{¶61} R.C. 2919.22 states, in pertinent part:

(B) No person shall do any of the following to a child under eighteen years of age * * * :

(1) Abuse the child[.]

(E)(2) If the offender violates division * * * (B)(1) of this section, endangering children is one of the following * * * :

* * *

(d) If the violation of division (B)(1) of this section and results in serious physical harm to the child involved, a felony of the second degree.

The mens rea for endangering children is recklessness. *State v. Adams*, 62 Ohio St.2d 151 (1980), paragraph one of the syllabus. "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).

{¶62} R.C. 2903.11 states, in pertinent part:

(A) No person shall knowingly do either of the following:

(1) Cause serious physical harm to another or to another's unborn[.]

\* \* \*

(D)(1)(a) Whoever violates this section is guilty of felonious assault. Except as otherwise provided in this division or division (D)(1)(b) of this section, felonious assault is a felony of the second degree.

{¶63} Regarding involuntary manslaughter, R.C. 2903.04(B) states, in pertinent part: "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a misdemeanor of any degree[.]" Further, for the predicate offense of reckless assault, R.C. 2903.13(B) states: "No person shall recklessly cause serious physical harm to another or to another's unborn." R.C. 2903.041 proscribes reckless homicide, stating: "No person shall recklessly cause the death of another or the unlawful termination of another's pregnancy."

{¶64} We first determine whether the evidence, viewing it in the light most favorable to appellant, was reasonably sufficient to support an acquittal on the charge of felony murder with the predicate offense of endangering children. If it was not, under *Wine*, instruction on any lesser offense was not warranted.

{¶65} The testimony and other evidence presented at trial do not reasonably support an acquittal on the charge of felony murder with the predicate offense of endangering children. It is undisputed that R.C. was under eighteen years of age. It is also undisputed that R.C. was in appellant's care prior to death.

{¶66} When considering the video of appellant's December 2, 2015 interview and re-enactment of the "piledriver" maneuver and Dr. Felo's testimony, there is unrefuted evidence that appellant, a large adult man, performed more than one "piledriver"

19

maneuver on R.C., a 37-pound 3-year-old child. The evidence further established without question that R.C. suffered serious harm from the incident, which ultimately led to his untimely death.

{¶67} Appellant was charged with child endangering as a result of abusing R.C. It was a felony of the second degree due to the fact it caused serious physical harm. Based in part on appellant's own version of events, the evidence would not reasonably support an acquittal of this charge. Likewise, because it is not disputed that R.C. died as a result of the abuse, the evidence does not reasonably support an acquittal on the charge of felony murder. Therefore, the trial court was not permitted nor required to give the jury an instruction on involuntary manslaughter or reckless homicide.

{¶68} Appellant's second and third assignments of error are without merit.

{¶69} The judgment of the Trumbull County Court of Common Pleas is affirmed.

THOMAS R. WRIGHT, P.J.,

DIANE V. GRENDELL, J.,

concur.