[Cite as *State v. Wilson*, 2026-Ohio-65.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## PORTAGE COUNTY

| | |
|---|---|
| STATE OF OHIO, | CASE NO. 2024-P-0072 |
| Plaintiff-Appellee, | |
| - vs - | Criminal Appeal from the Court of Common Pleas |
| DAWAN R. WILSON, | |
| Defendant-Appellant. | Trial Court No. 2023 CR 01348 |

## OPINION AND JUDGMENT ENTRY

Decided: January 12, 2026
Judgment: Affirmed

*Connie J. Lewandowski*, Portage County Prosecutor, and *Theresa M. Scahill*, Assistant Prosecutor, 241 South Chestnut Street, Ravenna, OH 44266 (For Plaintiff-Appellee).

*Paul M. Grant*, 209 South Main Street, Eighth Floor, Suite 3, Akron, OH 44308 (For Defendant-Appellant).


JOHN J. EKLUND, J.

{¶1} Appellant, Dawan R. Wilson, appeals his judgment of conviction from the Portage County Court of Common Pleas. Following a jury trial, Appellant was convicted on one count of Aggravated Murder with a firearm specification in violation of R.C. 2903.01(A) for the death of Cheretta Frierson (Cheretta), one count of Aggravated Murder with a firearm specification in violation of R.C. 2903.01(B) for the unlawful termination of Cheretta's pregnancy, and one count of Aggravated Burglary with a firearm specification in violation of R.C. 2911.11(B).

{¶2}    Appellant has raised six assignments of error arguing the following: (1) the trial court abused its discretion by allowing a witness to read testimonial statements contained in Cheretta's prior application for a Civil Protection Order (CPO); (2) the trial court abused its discretion and violated his right to confrontation by allowing hearsay testimony from a three-year-old; (3) the trial court abused its discretion by failing to provide a jury instruction for the lesser included offense of Murder; (4) the prosecutor's closing arguments constituted prosecutorial misconduct; (5) Appellant's convictions were against the manifest weight of the evidence; and (6) cumulative error and other errors highlighted under the sixth assignment of error deprived Appellant of a fair trial.

{¶3}    Having reviewed the record and the applicable caselaw, we find Appellant's assignments of error to be without merit. First, although we find that the trial court erred in admitting hearsay evidence of Cheretta's statement in the CPO issued against Appellant, this error did not affect the outcome of the trial in light of the overwhelming evidence against Appellant. Second, there was no Confrontation Clause violation because the statement from a three-year-old was not testimonial. Third, Appellant was not entitled to a jury instruction on the lesser included offense of Murder because a reasonable view of the evidence would not result in an acquittal for Aggravated Murder but still result in a conviction for Murder. Appellant completely denied his involvement in the offense and was not entitled to a lesser included offense instruction. Fourth, the prosecutor did not engage in prosecutorial misconduct, and the prosecutor's statements directly addressed what the evidence had shown and what reasonable inferences the jury could draw from that evidence. Fifth, the evidence overwhelmingly supported Appellant's

Case No. 2024-P-0072

convictions for Aggravated Murder. Finally, there was no cumulative error, and none of the additional issues Appellant highlighted constituted error.

{¶4} Therefore, we affirm the judgment of the Portage County Court of Common Pleas.

**Substantive and Procedural History**

{¶5} On December 7, 2023, Appellant was indicted on two counts of Aggravated Murder, Unclassified Felonies in violation of R.C. 2903.01(A) (Counts One and Two); two counts of Aggravated Murder, Unclassified Felonies in violation of R.C. 2903.01(B) (Counts Three and Four); and one count of Aggravated Burglary, a first-degree felony in violation of R.C. 2911.11 (Count Five). Each count contained a firearm specification in violation of R.C. 2929.14(D) and R.C. 2941.145.

{¶6} Counts One and Two alleged that Appellant acted with prior calculation and design to cause the death of Jane Doe and cause the unlawful termination of her pregnancy. Counts Three and Four alleged that Appellant caused the death of Jane Doe and the unlawful termination of her pregnancy while committing or attempting to commit or while fleeing immediately after committing or attempting to commit Aggravated Burglary.

{¶7} Appellant pled not guilty and received court appointed counsel. However, Appellant later elected to represent himself, and the trial court provided court appointed counsel as advisory counsel.

{¶8} A jury trial commenced on June 20, 2024. However, the matter resulted in a mistrial before the jury was impaneled. No error has been assigned relating to this mistrial.

{¶9} The second jury trial commenced on September 23, 2024, and proceeded for five days. The following facts and evidence were adduced at trial.

{¶10} The State called Rachel Perry, a dispatcher clerk at the Kent Police Department. She said that on November 21, 2023, she received an emergency call at 2:11 p.m. The caller said that he had heard gunshots from a neighbor and that he believed someone had been shot. The caller described a person of interest as a "tall black guy." Officers arrived at the scene at 2:15 p.m.

{¶11} Officer Leonard Kunka, Officer Mitchell Smith, Officer Timothy Cole, Officer Samantha Burton, and Detective Norman Jacobs of the City of Kent Police Department testified that they were dispatched to South Water Street in Kent, Ohio, in reference to gunfire. Officer Kunka said the residence was a duplex unit. He knocked on the door to make contact and heard a crying child, later identified as K.M. (DOB 11-28-2019), approach the door. Officer Kunka asked K.M. to open the door, but she was unable to do so. Officer Kunka talked to K.M. through the door and asked if anybody was hurt. K.M. responded: "Mommy."

{¶12} Officer Kunka was able to open a nearby window and reach into the house to unlock the door. As he did this, K.M. "locked eyes" with Officer Kunka, and "one of the first words that came out of her mouth through the crying that I could hear and understand was, [']daddy shot mommy.[']" K.M. also said that "mommy's downstairs."

{¶13} Officer Kunka entered the house and found Cheretta "on the basement floor at the bottom of the steps. Head towards the steps, . . . and she's got blood just all around her head on the floor, not moving, appears to be deceased." Officer Kunka also

Case No. 2024-P-0072

discovered an infant child, later identified as T.M., in a bed about eight feet away from the victim.

{¶14} Mesut Kose testified that he lived in the adjoining duplex unit next to Cheretta. He said that on November 21, 2023, someone rang his doorbell, and he answered. The person at the door asked if Kose knew who drove a particular car in the parking lot. Kose said he did not and closed the door. He said that a few minutes later, he heard three or four loud banging noises, which he thought were gunshots, and he called 911. Kose also had a video doorbell camera that was activated whenever someone rang the doorbell. The camera showed that the suspect was the passenger in a vehicle and that he arrived and left in the same vehicle. The camera also showed the suspect toss a cigar into a grassy area beside the porch of the apartment.

{¶15} Alexander Gaskin, a firefighter/paramedic for the City of Kent Fire Department, testified that he performed several assessments on Cheretta at the scene and found her to be deceased. However, he said that her body was warm to the touch and was still actively bleeding. He said this would indicate that she had not been deceased for a long period of time.

{¶16} After several officers had testified about K.M.'s statements at the scene of the crime, Appellant requested a sidebar where he said that he wanted to make a motion to make sure the record reflected that the State was basing "their whole case on a three-year-old's testimony. Man, she's a three-year-old and she's not a competent witness. Somebody that can't even be cross-examined. So I just want the record to reflect for it so I can come back on appeal if I get found guilty that they base it their whole case on a three-year-old's testimony." The trial court denied Appellant's motion.

Case No. 2024-P-0072

{¶17} Officer Burton testified that on October 30, 2023, she had been working in dispatch and that she received a call from Appellant seeking a welfare check on his child, T.M. He said that Cheretta was the mother of his child and that she was staying with her sister, Chakea Frierson. Based on this call, Officer Burton dispatched officers to perform a welfare check.

{¶18} Officer Burton was working dispatch on November 18, 2023 when Appellant called to follow up on the status of the welfare check and to confirm that Cheretta had been located in Kent, Ohio.

{¶19} After the shooting, Officer Burton used the information obtained from these calls and was able to determine that Appellant had been living in Goodyear, Arizona. Officer Burton obtained a driver's license picture of Appellant. She said that it was a match for the person seen on Kose's doorbell camera.

{¶20} Larry Hootman, a special agent for the Ohio Bureau of Criminal Investigation and Identification (BCI), testified that he processed the crime scene and collected evidence for later testing. He said that he collected and sealed a cigarillo style cigar found beside the front porch. Hootman collected DNA samples, cartridge casings, and projectile fragments that were found near Frieson's body and other items of interest for the investigation.

{¶21} Detective David Marino testified that he is the Kent Police Department evidence coordinator. He said that the cigar submitted to BCI tested positive for DNA consistent with Appellant's sample.

{¶22} Dr. David Dolinak, a deputy medical examiner at the Cuyahoga County Medical Examiner Department, testified that he performed Cheretta's autopsy on

Case No. 2024-P-0072

November 22, 2023. He said that Cheretta "had a gunshot wound to the back left side of her head. She had two gunshot wounds to the right side of her face. She had a gunshot wound at the side of her mouth. And she had a gunshot wound o[n] her left arm."

{¶23} Dr. Dolinak said that three of the gunshot wounds to the head showed signs of black gunpowder soot or burned gunpowder on her scalp and the undersurface of the bone that had been forced into the body when the bullet was fired." This observation, in addition to the shape of the entry wounds, suggested that the "gun was placed right against the skin when it was fired." One gunshot wound to the head indicated the shot was made at close range but not in actual contact to the skin. Dr. Dolinak said that the gunshot wound to Cheretta's left forearm was superficial and likely resulted from a bullet exiting the face and penetrating the forearm.

{¶24} Dr. Dolinak also testified that he examined Cheretta's uterus and found an "intact amniotic sac" with a normally developing fetus "somewhere around eight to nine gestational weeks." He said that the cause of death for Cheretta was the gunshot wounds and that when she died, her pregnancy was also terminated.

{¶25} Emily Feldenkris, a forensic scientist in the DNA section at BCI, testified that she conducted DNA testing on several items. She said that the recovered cigar had a DNA profile consistent with the DNA standard obtained from Appellant.

{¶26} Chakea Frierson testified that she was Cheretta's sister. Chakea said that Appellant and Cheretta dated for a period of time and that T.M. was Appellant's child. Chakea said that Appellant acted as a father figure to K.M. and that K.M. referred to him as "daddy" despite not being her biological father. Chakea said that K.M. never lived with her biological father.

Case No. 2024-P-0072

{¶27} Chakea testified that Cheretta was living with Appellant in Arizona. However, due to concerns about her safety, Chakea advised Cheretta to leave Appellant and come live with her in Kent, Ohio. Chakea sent Cheretta $300.00 so she could make the trip. Cheretta left Arizona in the middle of the night on October 19, 2023.

{¶28} When Cheretta arrived, she stayed in Chakea's basement. After she arrived in Ohio, Cheretta obtained a CPO against Appellant and was planning to change her name because she feared that Appellant would find her. Chakea said that she had heard Appellant talk to Cheretta on the phone and heard him say that "he was going to find her and kill her."

{¶29} During Chakea's cross-examination, Appellant repeatedly asked inappropriate questions, attempted to testify or editorialize directly to the jury, and disregarded the trial court's repeated warnings to stop asking inappropriate questions. This culminated in Appellant disregarding the trial court's repeated orders to stop questioning the witness. Instead, Appellant repeatedly accused Chakea of murdering Cheretta and covering up the murder for insurance purposes.

{¶30} The trial court ordered a brief recess and said the following, outside of the presence of the jury:

> Since I have warned and warned and warned and warned and warned and warned the Defendant, he is going to be placed in holding. He will send out questions with [advisory counsel] we will proceed with this trial. You can take him to holding and set that up, and we're going to take a ten-minute break and then we'll start the trial back up.

{¶31} Upon resuming proceedings, the trial court stated the following for the record, outside the presence of the jury:

> I've removed the Defendant from the courtroom to protect the integrity, order and decorum of the court. Also, to protect the safety of my staff, the participants in this trial, the witnesses, the jury members and those in the

Case No. 2024-P-0072

gallery. The defendant has not only been disrespectful numerous times in this courtroom, but has also tried to provoke a member of the victim's family. Therefore, for today, he will remain down in the holding cell with counsel and will be watching this case by video.

I'm going to – and he will be permitted to ask questions, but if they are disrespectful, if they are, you know, provoking any of the witnesses, then I'm going to have him muted and [advisory counsel] will bring in questions up from holding.

Again, [Appellant] has counsel in the room with him, and he can advise him as to the proper route of questioning.

At this time, I'm going to do individual voir dire of the jurors and I'm going to be the only one asking questions.

{¶32}   The video stream was a two-way feed, and those in the courtroom could see Appellant seated at a table. Appellant was not handcuffed and did not appear to be in a jail cell.

{¶33}   The trial court brought each juror into the courtroom individually and explained that she removed Appellant from the courtroom "to protect the safety and the decorum and the integrity of this courtroom." The trial court said that Appellant would "watch from another room . . . [b]ut he will be able to ask questions, he has his attorney with him . . . but I just didn't want something to break out in the courtroom." The trial court asked each juror if they could remain fair and impartial knowing that Appellant would be absent from the courtroom. Each juror said that they could remain fair and impartial.

{¶34}   Appellant was able to continue his cross-examination via video. He asked Chakea, "[w]hy did you kill Cheretta?" Chakea denied killing her sister and accused Appellant of committing the murder. Appellant then asked if Chakea had a life insurance policy on Cheretta. Chakea said she did not. Appellant asked, "[w]hy, after killing Cheretta, you left and locked the door and left them kids in the house?" The State objected

to this question, and, in responding to the objection, Appellant said that Chakea "knows what happened that day. Bottom line. She knows what happened. . . . Everybody knows she knows what happened." The trial court warned Appellant that if he continued to disrupt, his audio feed would be muted and that advisory counsel would bring Appellant's questions to the courtroom.

{¶35} Appellant moved on to a different line of questioning but did not ask questions and instead continued to make declarative statements in an attempt to introduce his own statements as evidence. The trial court said that Appellant had "been warned and warned and warned. We're going to place – we're going to place him on mute." The trial court asked advisory counsel to ask Appellant's relevant questions in court on his behalf. However, Appellant said that he had no further questions of Chakea.

{¶36} The State called Skye Harmon, the girlfriend of co-defendant Michael Lollar. Harmon said that on the date of the murder, Lollar asked her to drive him to the airport to pick up Appellant, who was a friend. According to Harmon, Appellant said that he had come to Ohio to visit his child's mother. She said that Appellant told her that he had a daughter that called him "daddy" that he helps raise her and a son. She said that Appellant did not have any luggage or baggage.

{¶37} Later in the day, Lollar and Appellant left and said they were going to visit the mother of Appellant's baby. The two returned in the evening. Appellant stayed with Lollar and Harmon for several days. Harmon said that a day or two after the murder, she was alone in the house with Appellant. She was getting ready to take a shower and overheard Appellant "basically crying saying that he – that he killed – that he killed her." She heard him say this "[a]t least three times."

Case No. 2024-P-0072

{¶38}   After hearing this, Harmon tried to verify what she had heard by searching the internet, where she found an article about Cheretta's murder. She then asked Lollar about it. Lollar admitted that Appellant had killed Cheretta and admitted that his car had been at the scene of the crime. Harmon demanded that Appellant leave the house. She and Lollar gave him money to buy a bus ticket and leave. She did not know where he went. Harmon said that she did not contact the police because she was scared. Appellant cross-examined Harmon via the video feed.

{¶39}   On the next day of trial, the trial court instructed the jury and said:

The Defendant has the right to be in courtroom at every stage of the trial unless the Defendant's conduct is so disruptive that the trial cannot reasonably be conducted with the Defendant's continued physical presence in the courtroom.

Yesterday, the Court concluded, due to [Appellant's] conduct, that the trial would proceed in [Appellant's] absence and with remote contemporaneous videos as if [Appellant] were present.

The Court has now permitted [Appellant] to return to the courtroom. You may not consider [Appellant's] conduct or prior absence for any purpose. Nor are you to consider the Court's response to the conduct. You must decide this case solely on the evidence presented. Do you all understand that?

The jurors responded that they did. Appellant was in the courtroom for the remainder of the trial.

{¶40}   Officer Tyler Strebel of the Kent Police Department testified that on October 30, 2023, he received a call for service to conduct a welfare check on a child in a residence due to concerns about drugs, guns, and criminal activity at the residence. Officer Strebel went to the given address but found the occupant no longer lived there. He determined the current address was on South Water Street and made contact with Cheretta.

{¶41} Officer Strebel learned that Cheretta had left Arizona due to a domestic situation and was living with her sister. Cheretta did not want Appellant to know where she lived. Therefore, Officer Strebel conducted the welfare check but did not notify Appellant.

{¶42} Larry Richard, a victim advocate with the Portage County Prosecutor's Office, testified that he met Cheretta on October 31, 2023. Cheretta came in under stress and concerned for her safety. Richard provided her with resources to help victims of domestic abuse.

{¶43} The State introduced a certified copy of a CPO that the Portage County Court of Common Pleas granted to Cheretta against Appellant on November 2, 2023, and a certified copy of the death certificate finding the manner of death to be homicide for Cheretta and her fetus.

{¶44} Officer Christopher Mitchell, a probation officer and location monitoring specialist with the United States Courts, testified that he was supervising Lollar on a GPS ankle monitor due to a pending case. He said that the Kent Police Department contacted him to obtain Lollar's movement history. Mitchell provided that information to the investigators.

{¶45} City of Kent Police Detective Matthew Noah testified that he issued a subpoena to Frontier Airlines for Appellant's flight records. Those records indicated that Appellant purchased a one-way ticket for a flight from Arizona to Cleveland, Ohio, arriving on November 21, 2023.

{¶46} Detective John Gormsen of the City of Kent Police Department testified as to his investigation of Cheretta's murder. He said that he extracted and analyzed

Case No. 2024-P-0072

cellphone data for cellphones associated with Appellant, Harmon, and Lollar, as well as Lollar's ankle monitor GPS data. The location tracking data for the three indicated that on the morning of November 21, 2023, all of the devices joined at the Cleveland airport and traveled to Akron, where Harmon's phone separated and Appellant and Lollar's devices went into Kent and arrived at the scene of the murder at South Water Street. Detective Noah said that Appellant and Harmon's devices arrived at 2:07 p.m., that Appellant rang Kose's doorbell camera at 2:08 p.m., and that the camera showed him walking away at 2:11 p.m. Detective Noah stated that Appellant was seen wearing the same clothing in the video he uploaded from the Phoenix airport and in the video on Kose's doorbell camera.

{¶47} Detective Gormsen testified that Appellant's cellphone data included videos of himself that he posted publicly from the Phoenix, Arizona, airport. In one video, Appellant said, "For people who hated on me I'm on your bumper."

{¶48} Detective Gormsen said that the U.S. Marshals arrested Appellant in Harris County, Texas, on December 4, 2023. After he was arrested, Appellant denied that he was in Kent, Ohio. After learning that he was seen on Kose's doorbell camera, Appellant stated that he was in Kent, Ohio, to see his son. Detective Gormsen also said that Appellant admitted in a jail house call that "[a]ll I know is that I went to go see my son and I didn't get a chance to see him and I left. Now what happened after that, I don't know." In another jail house call, Appellant claimed he did not know what happened with Cheretta's murder and added, "I wasn't there when that – all that took place, you know what I'm saying?"

{¶49} Detective Gormsen testified about Cheretta's CPO against Appellant and read Cheretta's written statement from the application. In that statement, Cheretta detailed that she was afraid of Appellant because he said that he was going to kill her. The statement also detailed how Appellant had continued to make contact with her after she left Arizona. Appellant did not object to Detective Gormsen reading this statement. However, he did object to the admission of the CPO into evidence at the close of the State's case. The trial court admitted the certified copy of the CPO "[f]or what it's worth[.]"

{¶50} During cross-examination, Appellant asked Detective Gormsen to list the evidence he believed implicated Appellant of committing the crime. On redirect examination, the State asked Detective Gormsen a series of questions about whether there was eyewitness evidence, a confession, and video evidence. Detective Gormsen said "yes" to each of these questions. On re-cross examination, Appellant asked Detective Gormsen, "What confession do you have?" Detective Gormsen answered, "I believe [Harmon] already testified and spoke, so I – I was told that you said that you – something along the lines you can't believe you killed her, that you killed and –." Appellant responded: "That's not a confession. That's a witness statement." After some back and forth, Appellant again said, "Well, that's not a confession. Let's – let's go ahead and reword . . . that." Detective Gormsen said, "All right. That's – then we can reword it."

{¶51} The State rested its case, and Appellant called one witness, Jermaine McBee. McBee said that he had dated Chakea for "a few years." He said that Chakea called him on the date of the murder to ask to be with him because she did not feel safe. Chakea called him after 2:00 p.m. to tell him that Cheretta was dead. McBee said he asked her where Cheretta was, and she told him that Cheretta "was right here dead."

Appellant asked several questions about whether that meant that Chakea had gone into the house or not. However, McBee said that he did not believe Chakea entered the house and instead meant that she was at the house "not saying that she's right here, like, next to her, but she's here dead at the house." Appellant also asked if McBee was sleeping with Cheretta and whether Chakea killed her out of jealousy. McBee denied this. Appellant also asked several questions designed to suggest that McBee committed the murder, which he denied.

{¶52} During closing argument, the State addressed the issue of Appellant's confession, saying that Harmon testified that "she heard [Appellant] say, I can't believe I killed her. He said that over and over again. . . . That's an admission of guilt. Those words came from [Appellant's] lips. *I call that a confession."* (Emphasis added.)

{¶53} The jury found Appellant guilty on all counts.

{¶54} On October 2, 2024, the trial court sentenced Appellant. The State elected to proceed to sentencing on Counts One and Four, with Counts Two and Three merging for sentencing purposes. The trial court sentenced Appellant to life in prison without parole on Counts One and Four, with mandatory three-year prison terms on both gun specifications to run consecutively. On Count Five, the trial court sentenced Appellant to an indefinite prison sentence of 11 to 16.5 years with a mandatory three-year prison term on the gun specification to run concurrent to the other counts.

{¶55} Appellant timely appealed raising six assignments of error.

**Assignments of Error and Analysis**

{¶56} We address Appellant's first and second assignments of error together.

{¶57} Appellant's first assignment of error states: "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ALLOWED TESTIMONIAL STATEMENT[S] CONTAINED IN THE APPLICATION FOR A CIVIL PROTECTION ORDER TO BE READ INTO THE RECORD REACORD IN VIOLATION OF MR. WILSON'S CONSTITUTIONAL RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."

{¶58} Appellant's second assignment of error states: "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ALLOWED HEARSAY STATMENTS MADE BY A THREE-YEAR-OLD WHO WAS INCOMPET[E]NT TO PROVIDE TESTIMONY IN VIOLATION OF MR. WILSON'S CONSTITUTIONAL RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."

{¶59} Under his first assignment of error, Appellant argues that the trial court abused its discretion by permitting Cheretta's statement, written in her CPO, to be read into the record and by allowing the victim advocate Richard to testify about Cheretta's fear of Appellant. Although Appellant objected to the admission of the CPO itself, Appellant did not contemporaneously object to Detective Gormsen reading Cheretta's statement into the record or Richard's testimony. Therefore, he has waived all but plain error on this issue.

{¶60} Likewise, under his second assignment of error, Appellant argues that the trial court erred by allowing testimony from various witnesses about then three-year-old K.M.'s statement that "daddy shot mommy." He argues that this statement was hearsay, and its admission violated the Confrontation Clause. He also argues that K.M. was not

competent to testify, and her statement should have been excluded. Appellant did contemporaneously object to the questioning that elicited this testimony.

{¶61} This Court has held that whether evidence constitutes inadmissible hearsay is a question of law subject to de novo review. *Morford v. Morford*, 2018-Ohio-3439, ¶ 12 (11th Dist.). "'Determining whether the evidence is offered for an impermissible purpose does not involve the exercise of discretion . . . , an appellate court should scrutinize the [trial court's] finding under a de novo standard of review.'" *State v. Hartman*, 2020-Ohio-4440, ¶ 22, quoting Leonard, *The New Wigmore: Evidence of Other Misconduct and Similar Events*, § 4.10 (2d Ed. 2019). This is because Evid.R. 802 specifically provides that "[h]earsay is not admissible." Therefore, "the trial court's decision to admit hearsay is not governed by the test of abuse of discretion, which the Supreme Court applies to instances where the trial court's evidentiary rulings relate to matters expressly or implicitly within its discretion, as in rulings on relevancy (Evid.R. 402 and 403) or expert testimony (Evid.R. 702)." *State v. Sorrels*, 71 Ohio App.3d 162, 165 (1st Dist. 1991).

{¶62} Under the United States Constitution, a criminal defendant has a right to confront witnesses. The Sixth Amendment's Confrontation Clause, which is binding on the states through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" Article I, Section 10 of the Ohio Constitution states that "[i]n any trial, in any court, the party accused shall be allowed . . . to meet the witnesses face to face . . . ." While these constitutional provisions are not identical, the Ohio Constitution "'provides no greater right of confrontation than the Sixth Amendment.'" *State v. Arnold*, 2010-Ohio-2742, ¶ 12, quoting *State v. Self*, 56 Ohio St.3d 73, 79 (1990).

{**¶63**} Confrontation Clause violations are subject to harmless error analysis. *State v. Edwards*, 2013-Ohio-1290, ¶ 27 (11th Dist.). "'A constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt.'" *Id.*, quoting *State v. Conway*, 2006-Ohio-791, ¶ 78.

{**¶64**} The right to confrontation applies to all testimonial statements. *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004). "[T]he admission of a testimonial hearsay statement made by a declarant who does not testify at trial violates the Sixth Amendment unless (1) the declarant is unavailable and (2) the defendant had a prior opportunity to cross-examine the declarant." *State v. Neyland*, 2014-Ohio-1914, ¶ 173, citing *Crawford* at 68.

{**¶65**} "The proper inquiry for determining the testimonial nature of a statement is 'whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.'" *State v. Metter*, 2013-Ohio-2039, ¶ 35 (11th Dist.), quoting *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).

{**¶66**} However, the "Confrontation Clause does not prohibit the introduction of all out-of-court testimonial statements by witnesses who are unavailable and have not been subject to confrontation." *State v. Lewis*, 2007-Ohio-1485, ¶ 41 (1st Dist.). *Crawford* held that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford* at 59, fn. 9. Where an officer's testimony about an unavailable declarant's testimonial statement is "not offered to prove the truth of the matter asserted," it does not violate the defendant's right to confront witnesses. *State v. Ricks*, 2013-Ohio-3712, ¶ 18. Where the testimony

Case No. 2024-P-0072

at issue is offered to "'explain the subsequent investigative activities of the witness'" and not offered to prove the truth of the matter asserted, it does not violate a defendant's right to confront witnesses. *Id.* at ¶ 20, quoting *State v. Thomas*, 61 Ohio St.2d 223, 232 (1980).

{¶67}  As to his first assignment of error, because Appellant did not raise this issue below, "under the circumstances of this case, appellant has forfeited all but plain error on review." *State v. Carnes*, 2015-Ohio-4429, ¶ 8 (11th Dist.). "Crim.R. 52(B) affords appellate courts discretion to correct '[p]lain errors or defects affecting substantial rights' notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court." *State v. Rogers*, 2015-Ohio-2459, ¶ 22. The appellant bears the burden of demonstrating plain error by proving that the outcome would have been different absent the plain error. *State v. Payne*, 2007-Ohio-4642, ¶ 17. The plain error must be a deviation from a legal rule and an obvious defect in the proceedings. *Rogers* at ¶ 22.

{¶68}  Further, even when the error is obvious, "it must have affected substantial rights," meaning "'that the trial court's error must have affected the outcome of the trial.'" *Id.*, quoting *State v. Barnes*, 2002-Ohio-68, ¶ 20. This is the same deferential standard applied for "reviewing ineffective assistance of counsel claims." *Id.* Indeed, "even if an accused shows that the trial court committed plain error affecting the outcome of the proceeding, an appellate court is not required to correct it . . . ." *Id*. at ¶ 23. Courts are cautioned "to notice plain error 'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Barnes* at ¶ 21, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

{¶69}  First, as to the admission of the CPO, the CPO itself was a certified record and authenticated through a records custodian. *See* Evid.R. 901; Evid.R. 902. Next, although the State's brief does argue why Cheretta's CPO statement does not violate Appellant's right to confront witnesses, the State does not offer any argument regarding whether a hearsay exception applies to the statement. We find no hearsay exception would apply to Cheretta's written CPO statement.[1] As part of our de novo review, we conclude that the trial court erred in allowing Detective Gormsen to read Cheretta's CPO statement into the record.

{¶70}  However, given that we review this issue for plain error, we conclude that the admission of this hearsay statement did not affect the outcome of the trial. For the reasons discussed in more detail under Appellant's fifth assignment of error, the evidence against Appellant was overwhelming and unquestionably supported the jury's verdict that he committed the murders with prior calculation and design. Because we determine that the CPO statement was inadmissible hearsay, we need not determine whether it also constituted a violation of the Confrontation Clause.

{¶71} As to Cheretta's statements to the victim advocate, Richard testified primarily to Cheretta's fear, anxiety, and her urgent concern for her safety. These statements were admissible hearsay because they reflected Cheretta's then existing state of mind, emotion, or physical condition. *See* Evid.R. 803(3). Further, the admission of these statements did not violate the Confrontation Clause because they predated the commission of the offense against Cheretta. Cheretta could not have anticipated that her

---

1. Notably, Evid.R. 804(B)(6), covering forfeiture by wrongdoing, does not apply to statements made by the victim in a homicide prosecution. *State v. McCarley*, 2008-Ohio-552, ¶ 15 (9th Dist.), citing 2001 Staff Notes to Evid.R. 804.

Case No. 2024-P-0072

statement to the victim advocate would be "used against the accused in investigating and prosecuting *the crime*.'" (Emphasis added). *State v. Metter*, 2013-Ohio-2039, ¶ 35 (11th Dist.), quoting *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004). At the time she made the statement in the CPO, "*the crime*" had not yet been committed. Therefore, it was impossible for her to anticipate that the statement she made would be used against Appellant in investigating and prosecuting her own murder and for the unlawful termination of her pregnancy. *See id*..

{¶72}  Turning to K.M.'s statement that "daddy shot mommy," we conclude that there was no error in its admission. K.M. made that statement to Officer Kunka in the heat of an investigation into a call for gunfire. K.M. made the statement as an excited utterance shortly after her mother had been shot. Therefore, the statement was admissible hearsay under Evid.R. 803(2).

{¶73}  Next, Appellant's arguments that K.M.'s statements were a violation of his right to confront witnesses are unavailing because "[s]tatements by very young children will rarely, if ever, implicate the Confrontation Clause." *Ohio v. Clark*, 576 U.S. 237, 247-248 (2015). *Clark* determined that "it is extremely unlikely that a 3–year–old child in L.P.'s position would intend his statements to be a substitute for trial testimony. On the contrary, a young child in these circumstances would simply want the abuse to end, would want to protect other victims, or would have no discernible purpose at all." *Id.* at 248. When K.M. said that "daddy shot mommy," it was extremely unlikely that she made that statement as a substitute for trial testimony. She had just witnessed a traumatic event, saw a police officer offering assistance, and informed him of what she had seen.

Case No. 2024-P-0072

{¶74} Appellant also argues that then three-year-old K.M. was not a competent witness and that the statement should have been excluded. However, "an excited utterance does not generally involve an inquiry relating to a declarant's Evid.R. 601 competency as a witness." *State v. Bennett*, 2006-Ohio-2757, ¶ 11 (4th Dist.), citing 2 Giannelli & Snyder, *Evidence*, § 803.13, at 97 (2d Ed. 2001) (collecting cases). Further, the reliability and credibility of K.M.'s statement are buoyed by the fact that she correctly identified the location of her mother's body "downstairs."

{¶75} Accordingly, Appellant's first and second assignments of error are without merit.

{¶76} Appellant's third assignment of error states: "THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO PROVIDE JURY INSTRUCTIONS ON THE LESSER INCLUDED OFFENSE OF MURDER IN VIOLATION OF MR. WILSON'S DUE PROCESS RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 AND 16 OF THE OHIO CONSTITUTION."

{¶77} Appellant argues that his failure to object to the jury instructions as drafted by the trial court was plain error because the evidence at trial did not support the prior calculation and design element of Aggravated Murder. On this basis, he argues that the trial court erred in not giving the jury a lesser included offense instruction for Murder.

{¶78} "When the indictment or information charges an offense, including different degrees, or if other offenses are included within the offense charged, the jury may find the defendant not guilty of the degree charged but guilty of an inferior degree thereof or lesser included offense." R.C. 2945.74. *See also* Crim.R. 31(C) ("if lesser offenses are

included within the offense charged, the defendant may be found not guilty of the degree charged but guilty of an inferior degree thereof, or of a lesser included offense").

{¶79}  "A criminal defendant is entitled to a lesser-included-offense instruction, however, only where the evidence warrants it." *State v. Kidder*, 32 Ohio St.3d 279, 280 (1987). "When a lesser included offense instruction is requested, the trial court's task is twofold: 'first, it must determine what constitutes a lesser included offense of the charged crime; second, it must examine the facts and ascertain whether the jury could reasonably conclude that the evidence supports a conviction for the lesser offense and not the greater.'" *State v. Arcuri*, 2016-Ohio-8254, ¶ 64 (11th Dist.), quoting *Kidder* at 280

{¶80}  When deciding whether to give a lesser-included-offense instruction, "the trial court essentially engages in a sufficiency of the evidence analysis." *State v. Harper*, 2018-Ohio-2581, ¶ 58 (11th Dist.). "[S]ufficiency of evidence is a legal analysis, not one subject to the discretion of the trial court." *Id.* "Accordingly, we review the trial court's decision with regard to the sufficiency necessary to give the [lesser included] instruction de novo as a matter of law and without deference to the trial court." *Id.*

{¶81}  Murder is a lesser included offense of Aggravated Murder. *State v. Bailey*, 90 Ohio App.3d 58, 72 (11th Dist. 1992). The only difference between the two statutes is the element of prior calculation and design.

{¶82}  The facts in this case do not support providing an instruction for the lesser included offense of Murder. The evidence at trial would not have supported an acquittal for Aggravated Murder on the basis that Appellant had not engaged in prior calculation and design in committing the killings but also supported a conviction for Murder. Appellant completely denied his involvement in the killings, and, as such, he was not entitled to the

instruction on the lesser included offense of Murder. *See State v. McKinney*, 2008-Ohio-3256 ¶ 162 (11th Dist.) (finding the appellant was not entitled to a jury charge on any of the requested lesser offenses where he denied any involvement in the offenses).

{¶83} Accordingly, Appellant's third assignment of error is without merit.

{¶84} Appellant's fourth assignment of error states: "THE PROSECUTOR'S REMARKS DURING CLOSING ARGUMENT AND FAILURE TO PROVIDE ALL EVIDENCE ROSE TO THE LEVEL OF PROSECUTORIAL MISCONDUCT WHICH DEPRIVED MR. LABRIOLA [sic] OF HIS RIGHT TO A FAIR TRIAL IN VIOLATION OF HIS 5TH, 6TH, AND 14TH AMENDMENT RIGHTS UNDER THE U.S. CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION."

{¶85} It appears that appellate counsel inadvertently referenced incorrect information in the assignment of error because Appellant's assignment of error refers to a different defendant and also appears to reference a failure to provide all evidence, which he does not reference in the body of his brief. We note this for clarity and accordingly address the actual arguments Appellant has made in the body of his brief under the fourth assignment of error.

{¶86} Appellant argues that the prosecutor committed misconduct by repeatedly asking witnesses if Appellant confessed and in expressing her personal belief that he had done so in closing arguments. During closing arguments, the prosecutor summarized Harmon's testimony, saying that Harmon was "petrified" to testify. The prosecutor argued that Harmon had testified that "she heard [Appellant] say, I can't believe I killed her. He said that over and over again. . . . That's an admission of guilt. Those words came from [Appellant's] lips. *I call that a confession."* (Emphasis added.)

Case No. 2024-P-0072

{¶87} Appellant also highlights the State's comments during closing arguments that Appellant first claimed that he did not know what was going on and later said that he had never been out to see Cheretta before were the "same trickery that he's been employing throughout this trial[.]"

{¶88} Appellant argues that it was improper for the State to express a personal belief and opinion as to the evidence presented and that it was inappropriate for the State to insinuate that Appellant was lying.

{¶89} Appellant did not object to the prosecutor's statements at trial. Therefore, he has forfeited all but plain error and must establish an obvious error resulting in prejudice. *See Rogers*, 2015-Ohio-2459, at ¶ 22-23.

{¶90} In a claim of prosecutorial misconduct, whether based on improper remarks or other conduct, we consider (1) whether the State's remarks or conduct were improper, and if so, (2) whether they prejudicially affected the appellant's substantial rights. *State v. Treesh*, 2001-Ohio-4, ¶ 22. The allegedly improper statements or conduct are evaluated in the context of the entire trial. *Id.* Improprieties do "not affect a substantial right of the accused if it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even without" them. *Id.*

{¶91} Prosecutors and defense counsel are afforded a wide degree of latitude during closing arguments to address what the evidence has shown and what reasonable inferences may be drawn from that evidence. *State v. Kelly*, 2012-Ohio-523, ¶ 63 (11th Dist.). "The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "The touchstone of analysis

Case No. 2024-P-0072

'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Smith*, 2000-Ohio-450, ¶ 87, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

{¶92}  The Supreme Court of Ohio has held that "[i]t is improper for an attorney to express his personal belief or opinion as to the credibility of a witness . . . ." *Smith*, 14 Ohio St.3d at 14. Further, "the [S]tate may not 'unfairly suggest[ ] that the defense's case was untruthful and *not honestly presented.*'" (Emphasis added.) *State v. Thompson*, 2014-Ohio-4751, ¶ 194, quoting *State v. LaMar*, 2002-Ohio-2128, ¶ 167. Prosecutors are permitted to make fair comments on the testimony and evidence. *See State v. Mundt*, 2007-Ohio-4836, ¶ 119 (finding the prosecutor's characterization of a rape as "brutal" was fair given the evidence). Likewise, "[a] prosecutor may not express his personal opinion about the guilt of the accused, unless he bases that opinion on the evidence presented in court." *State v. Keenan*, 66 Ohio St.3d 402, 408 (1993).

{¶93}  Here, the prosecutor's statements during closing were not inappropriate. The prosecutor described Harmon's testimony and fairly described her demeanor and her stated concerns about testifying. The prosecutor's argument that what Harmon heard was a confession was a fair comment given the evidence. The comments were particularly appropriate for the prosecutor to address during closing argument because Appellant had asked a series of questions during the trial to suggest that Harmon's testimony about the overheard statements did not constitute a confession. The prosecutor's comments about whether Appellant confessed were directly addressing what the evidence had shown and what reasonable inferences the jury could draw from that evidence.

{¶94}  Next, the prosecutor's comments about Appellant's trickery, in context, do not rise to the level of prosecutorial misconduct. The Supreme Court of Ohio has stated,

Case No. 2024-P-0072

"[r]ealism compels us to recognize that criminal trials cannot be squeezed dry of all feeling." *Keenan* at 409. However, a prosecutor may not "consistently substitute[] emotion for reasoned advocacy in his closing arguments." *Id.* at 407.

{¶95} The prosecutor's comments about trickery were certainly charged comments that can carry a range of meanings. However, given the overall context of the comment, it appears that the prosecutor was referencing Appellant's initial denial that he was in Ohio and later admission to being in Ohio to visit his son when his initial statements were no longer tenable. The prosecutor used that example of "trickery" and equated it to Appellant's actions during trial more broadly. Although the prosecutor did not give any specific examples at that time, the prosecutor later addressed the absurdity of Appellant trying to implicate Chakea in Cheretta's murder when Appellant was seen on the doorbell camera in the minutes before Kose called 911. The prosecutor's comment about Appellant's "trickery," particularly when taken in the context of the entire trial, was not the type of comment that substitutes emotion for reasoned advocacy.

{¶96} Accordingly, Appellant's fourth assignment of error is without merit.

{¶97} Appellant's fifth assignment of error states: "WILSON'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE POSSESSION [sic] IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION."

{¶98} When evaluating the weight of the evidence, we review whether the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other indicated clearly that the party having the burden

Case No. 2024-P-0072

of proof was entitled to a verdict in its favor, if, on weighing the evidence in their minds, the greater amount of credible evidence sustained the issue which is to be established before them. *State v. Thompkins*, 1997-Ohio-52, ¶ 24. "Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis deleted.) *Id.* Whereas sufficiency relates to the evidence's adequacy, weight of the evidence relates the evidence's persuasiveness. *Id.* at ¶ 37 (Cook, J., concurring).

{¶99} The trier of fact is the sole judge of the weight of the evidence and the credibility of the witnesses. *State v. Landingham*, 2021-Ohio-4258, ¶ 22 (11th Dist.); *State v. Antill*, 176 Ohio St. 61, 67 (1964). The trier of fact may believe or disbelieve any witness in whole or in part, considering the demeanor of the witness and the manner in which a witness testifies, his or her interest, if any, in the outcome of the case, and his or her connection with the prosecution or the defendant. *Landingham* at ¶ 22. This Court, engaging in the limited weighing of the evidence introduced at trial, is deferential to the weight and factual findings made by the factfinder. *State v. Brown*, 2003-Ohio-7183, ¶ 52 (11th Dist.). The reviewing court "determines whether . . . the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶100} A finding that a judgment is supported by the manifest weight of the evidence necessarily means the judgment is supported by sufficient evidence. *State v. Arcaro*, 2013-Ohio-1842, ¶ 32 (11th Dist.).

{¶101} Under this assignment of error, Appellant focuses on the prior calculation and design element of his Aggravated Murder convictions and does not address the Aggravated Burglary conviction or the firearm specifications. We therefore only address the Aggravated Murder convictions.

{¶102} R.C. 2903.01(A) provides: "No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy." R.C. 2903.01(B) provides: "No person shall purposely cause the death of another or the unlawful termination of another's pregnancy while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, . . . aggravated burglary . . . ."

{¶103} The phrase "prior calculation and design" is not defined in the Revised Code. *State v. Cotton*, 56 Ohio St.2d 8, 10 (1978). However, the Ohio Supreme Court has held that the phrase suggests "advance reasoning to formulate the purpose to kill. Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death." *State v. Walker*, 2016-Ohio-8295, ¶ 18.

{¶104} Even so, there is also no bright-line test to determine whether prior calculation and design are present. *State v. Taylor*, 1997-Ohio-243, ¶ 28. "Instead, each case turns on the particular facts and evidence presented at trial." *Id.*

{¶105} The Supreme Court of Ohio has held, "[w]here evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier

Case No. 2024-P-0072

of fact of prior calculation and design is justified." *Cotton* at paragraph three of the syllabus.

{¶106} The Supreme Court of Ohio has also used three factors to consider in determining whether a defendant acted with prior calculation and design: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?'" *Taylor* at ¶ 25, quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102 (8th Dist.).

{¶107} In this case, the evidence that Appellant committed the killings and did so with prior calculation and design is overwhelming. The State presented an incredibly thorough case, leaving no stone unturned and few, if any, questions left unanswered. Appellant's actions in planning and committing the offenses were blatant and unmistakable so as to border on farce if not for the gruesome result of his actions.

{¶108} In short, Cheretta left Arizona and came to Ohio to get away from Appellant. Despite that, he continued to harass and threaten her. Appellant posted vaguely threatening videos publicly on the internet. Appellant made two calls to the Kent Police Department to have the police perform a welfare check on Cheretta, which the jury reasonably could have viewed as a pretextual accusation designed to verify her location.

{¶109} Appellant purchased a one-way plane ticket to Ohio, traveled to Cheretta's residence, left DNA evidence behind when he threw a cigar on the ground, and rang a video doorbell that captured him wearing the same clothes as in a video he posted at the airport in Arizona. He talked to Kose and asked if Kose knew who drove a particular car in the parking lot. Within minutes of this, Kose heard gunshots and called 911. Four

minutes later, Officer Kunka arrived at the scene and found K.M., who told him that "daddy shot mommy" and that Cheretta was downstairs. Officer Kunka then found Cheretta dead at the bottom of the basement stairs. Cheretta's autopsy revealed that her otherwise healthy unborn child died, resulting in the termination of her pregnancy when she died.

{¶110} GPS and cell phone data indicate that Appellant left the Cleveland airport, traveled to Akron, and then went to Cheretta's residence in Kent. After the murders, Harmon overheard Appellant saying that he "killed her." When Harmon confronted Lollar about this, Lollar acknowledged that Appellant had killed Cheretta and that he had been in the car while this happened. After this, Harmon and Lollar gave Appellant bus fare to leave town.

{¶111} The manifest weight of the evidence strongly supports the presence of sufficient time and opportunity for Appellant to plan the homicides and that he implemented his scheme to kill Cheretta. The State was entitled to the verdict rendered in its favor.

{¶112} Accordingly, Appellant's fifth assignment of error is without merit.

{¶113} Appellant's sixth assignment of error states: "THE CUM[]ULATIVE EFFECT OF THE ERRORS DEPRIVED WILSON OF A FAIR TRIAL IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION."

{¶114} Appellant argues that if the errors alleged in his first through fifth assignments of error do not individually constitute reversible error, then their cumulative effect deprived him of a fair trial. He also argues that there were "numerous other errors"

Case No. 2024-P-0072

in addition to those argued separately above, which cumulatively deprived him of a fair trial.

{¶115} Specifically, he argues that he was delayed in putting forth his defense because he did not have discovery and evidence readily available to him and that he did not have the ability to interview witnesses or to hire an investigator. He also argues that the trial court improperly removed him from the court and continually admonished him about how he questioned witnesses and threatened to remove him from the court or to mute his audio feed once he was removed. Although he acknowledges that the trial court gave a curative instruction, he states this was inadequate to undo the prejudice caused.

{¶116} Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial, even though each of the numerous errors does not individually constitute cause for reversal." *Neyland*, 2014-Ohio-1914, at ¶ 257. "[M]ultiple errors that are separately harmless may, when considered together, violate a person's right to a fair trial in the appropriate situation." *State v. Goff*, 1998-Ohio-369, ¶ 96.

{¶117} Although we found one error in relation to the introduction of hearsay evidence, we have not found any other errors in any of Appellant's prior assignments of error. Nor do we find error in any of Appellant's argued additional errors noted under this assignment of error.

{¶118} First, Appellant had adequate and timely access to discovery. The record reflects that Appellant had access to discovery in May 2024, and trial did not commence until September 23, 2024. Because Appellant represented himself and was incarcerated prior to trial, the trial court took appropriate steps to furnish Appellant with a laptop and

Case No. 2024-P-0072

other technology necessary for him to access the discovery and prepare necessary motions. Any failure to file motions pertaining to pretrial discovery or to request funds to hire expert witnesses or investigators was Appellant's own failure.

{¶119} Next, a criminal defendant has the right to be present at every stage of the criminal proceedings and trial. U.S. Const., amend. VI, XIV; Ohio Const., art. I, § 10; Crim.R. 43(A). However, Crim.R. 43(B) provides that:

> [w]here a defendant's conduct in the courtroom is so disruptive that the hearing or trial cannot reasonably be conducted with the defendant's continued physical presence, the hearing or trial may proceed in the defendant's absence or by remote presence, and judgment and sentence may be pronounced as if the defendant were present. Where the court determines that it may be essential to the preservation of the constitutional rights of the defendant, it may take such steps as are required for the communication of the courtroom proceedings to the defendant.

{¶120} A trial court's decision to remove a defendant from the courtroom is reviewed on appeal for an abuse of discretion. *State v. Baskin*, 2019-Ohio-2071, ¶ 22 (3d Dist.). "The term 'abuse of discretion' . . . is one of art, connoting judgment exercised by a court which neither comports with reason, nor the record." *State v. Underwood*, 2009-Ohio-2089, ¶ 30 (11th Dist.). An abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2010-Ohio-1900, ¶ 62 (2d Dist.), quoting *Black's Law Dictionary* (8th Ed. 2004); *State v. Raia*, 2014-Ohio-2707, ¶ 9 (11th Dist.).

{¶121} "A jury is presumed to follow the instructions given to it by the trial judge." *State v. Loza*, 71 Ohio St.3d 61, 75 (1994). "Moreover, the alacrity with which the court issue[s] its curative instruction function[s] to further lessen the possibility of prejudice." *State v. Fitzgerald*, 2004-Ohio-6173, ¶ 50 (11th Dist.). Given Appellant's courtroom behavior, the trial court did not err in maintaining order and decorum in the court by

removing Appellant and having him question two witnesses via video in a plain room at a desk.

{¶122} The trial court did not abuse its discretion by repeatedly cautioning Appellant that he could face removal from the courtroom when he behaved inappropriately. The trial court questioned the jurors individually immediately after removing Appellant and asked if they could remain fair and impartial given Appellant's removal from the courtroom. The trial court provided an additional curative instruction the following morning. Appellant was permitted to continue questioning witnesses via video. The trial court allowed Appellant to return to the courtroom on the following day of trial and took timely and appropriate steps to ensure the jury would not use Appellant's behavior or the trial court's decision to remove him from the courtroom for any purpose.

{¶123} Finding no additional errors, the doctrine of cumulative error does not apply.

{¶124} Accordingly, Appellant's sixth assignment of error is without merit.

{¶125} For the foregoing reasons, the judgment of the Portage County Court of Common Pleas is affirmed.

EUGENE A. LUCCI, J.,

SCOTT LYNCH, J.,

concur.

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, Appellant's assignments of error are without merit. It is the judgment and order of this court that the judgment of the Portage County Court of Common Pleas is affirmed.

Costs to be taxed against Appellant.

_____
JUDGE JOHN J. EKLUND

_____
JUDGE EUGENE A. LUCCI,
concurs

_____
JUDGE SCOTT LYNCH,
concurs

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

Case No. 2024-P-0072